JOURNAL ENTRY AND OPINION
Appellant, Katrina Jones, appeals from the judgment of the Cuyahoga County Court of Common Pleas, Juvenile Division, committing her minor child, Zonisha Smith, to the permanent custody of defendant-appellee, Cuyahoga County Department of Children and Family Services (CCDCFS). For the reasons that follow, we affirm.
Zonisha Smith was born to appellant on April 6, 1996. Appellant was not married when Zonisha was born and, at various times, has named Willie (a/k/a Martino) Smith and Timothy Johnson as Zonisha's biological father. Johnson never established paternity, nor provided any care or support for Zonisha. Similarly, although Smith's name is on the birth certificate, he has denied that he is Zonisha's father and has never established paternity nor provided any care or support for Zonisha.
Appellant's two other children, Ashley Stuart and Zantare Anderson, were removed from appellant's home in February 1996, shortly before Zonisha was born, after Smith, appellant's boyfriend at the time, tried to drown Zantare in a bathtub. It was later learned that Smith had also sexually abused Ashley.
CCDCFS developed a case plan for appellant and Smith when Ashley and Zantare were removed from appellant's custody. The case plan included a psychological evaluation and parent education classes for both appellant and Smith and anger management classes for Smith. The plan also included domestic violence and rape crisis counseling for appellant as a result of her rape and physical abuse by Smith. Smith did not comply with any requirement of the case plan; appellant completed the parent education classes but nothing else. Eventually both Ashley and Zantare were committed to the legal custody of Ashley's father.
In November 1996, CCDCFS received information that appellant was neglecting Zonisha's medical needs. Upon investigation, CCDCFS learned that Zonisha had been admitted to the hospital suffering from ear and sinus infections which were so severe that they had gravitated to her skull, requiring extensive treatment and a lengthy hospitalization. Zonisha's doctors informed CCDCFS that Zonisha would continue to suffer from extensive medical problems upon her release from the hospital and expressed reservations regarding appellant's willingness and ability to address those problems. Consequently, on November 19, 1996, CCDCFS filed a complaint alleging Zonisha to be neglected and requesting temporary emergency custody. On November 21, 1996, the trial court granted CCDCFS temporary custody of Zonisha and, upon her release from the hospital, CCDCFS placed Zonisha in a specialized foster home for medically fragile children.
On February 1997, Zonisha was adjudicated neglected and committed to the temporary custody of CCDCFS. On April 14, 1998, CCDCFS filed a motion to modify temporary custody to permanent custody. The trial court held hearings regarding the motion on July 12, July 13, September 1, September 8 and November 18, 1999.
Teresa McDade, a CCDCFS social worker, testified that when Zonisha was removed from appellant's custody in 1996, CCDCFS developed a new case plan for appellant which required appellant to attend domestic violence counseling and complete a psychological evaluation. In addition, appellant was required to attend Zonisha's medical appointments and to maintain stable housing. In October 1998, as a result of recommendations from the psychological evaluation, individual counseling was also included as a requirement in the case plan.
McDade testified that appellant attended domestic violence counseling from April 1997 until October 1997. At that time, however, appellant informed McDade that she had not benefitted from the counseling. McDade then referred appellant for additional counseling. Appellant attended several more counseling sessions, but then stopped participating, informing McDade that she did not need and would not participate in any further counseling.
According to McDade, appellant told her that Smith had raped her in 1996. On another occasion, Smith struck appellant, causing bruising on her face and a black eye. In addition, appellant's older children were removed from her custody in 1996 because of appellant's abuse. According to McDade, appellant pursued domestic violence charges against Smith in February 1997 and obtained a restraining order against him. McDade testified that appellant continued to have a relationship with Smith, however, even after that time. In fact, appellant conceived a child — Amelia Jones — with Smith in August 1997.
McDade testified that Smith, who has convictions for drug trafficking, domestic violence and carrying a concealed weapon, was incarcerated from August 1998 through March 1999. In April 1999, after he was released from prison, the Juvenile Court ordered appellant to have no contact with Smith and to contact police immediately if he contacted her. McDade testified that in May 1999, however, just two months prior to the initial permanent custody hearing, appellant had two encounters with Smith. Appellant admitted to McDade that on one of the occasions, she spoke with Smith for twenty to twenty-five minutes and provided him with a picture of Amelia. McDade testified that on the other occasion, appellant told Smith that after she received custody of her children, she would allow him to visit Amelia. McDade testified that appellant told her she did not call the police as ordered on either occasion because she did not think they would come.
McDade testified that even though appellant had completed fourteen sessions of domestic violence counseling, she believed that appellant had not resolved the issues surrounding her violent relationship with Smith. For example, McDade testified that in October 1997 appellant told her that she still loved Smith and showed her letters that Smith had written her from prison, professing his love for her. In addition, in February 1998, appellant informed McDade that she believed Smith had the right to see Amelia because he was her father. According to McDade, appellant expressed no concern regarding Smith's actions toward her older children. McDade testified that in light of these conversations and appellant's contact with Smith as recently as May 1999, she did not believe that appellant had benefitted from the domestic violence counseling or was willing to protect her children from Smith. Consequently, McDade testified that she believed that permanent custody of Zonisha by CCDCFS was in Zonisha's best interest.
McDade also testified that one of the objectives of appellant's case plan required her to obtain a psychological evaluation. McDade testified that although she made five referrals for a psychological evaluation for appellant between June 1996 and September 1998, appellant failed to appear each time for the evaluation. Appellant finally completed the psychological evaluation on September 15, 1998 with Dr. Thomas Anuszkiewicz. As a result of the evaluation, appellant's case plan was amended in October 1998 to include the requirement of individual counseling.
McDade testified that appellant began attending counseling sessions at Murtis Taylor in December 1997, but stopped participating in the sessions in February 1998, without explanation. After appellant quit, McDade contacted Laurelwood Counseling Center on appellant's behalf. She also referred appellant to the Witness Victim Program in an attempt to assist appellant with her domestic violence issues. Appellant did not contact either program. McDade testified that she again attempted to refer appellant to counseling after the completion of the psychological evaluation, but appellant would not accept the referral. Appellant finally began individual counseling in April 1999, after the Juvenile Court had ordered her to do so.
Carol Blauman testified that she had been Zonisha's foster mother since November 1996, when Zonisha was released from the hospital. Blauman testified that as a result of her numerous medical problems, Zonisha required extensive medical care. According to Blauman, there were constant medical appointments and twelve hospitalizations during the first two years she cared for Zonisha, including one month where Zonisha was either at a doctor's appointment or at the hospital twenty-eight out of the thirty days of the month.
Blauman testified that she always made an effort to advise appellant of Zonisha's medical appointments and hospitalizations. In 1997, Blauman personally advised appellant of Zonisha's appointments when she dropped Zonisha off for her semi-monthly visits with appellant. Subsequently, when someone else began driving Zonisha to her visits with appellant, Blauman would inform appellant's social worker and put a note in Zonisha's diaper bag regarding pending appointments. Blauman estimated that appellant attended only two or three of Zonisha's medical appointments during the first year that she had Zonisha and only one or two appointments during the second year. Blauman acknowledged that appellant came to the hospital several times, however, during Zonisha's hospitalizations. Finally, Blauman testified that Zonisha had asthma that required three breathing treatments a day.
Rosemarie Conrad, a social worker at Berea Children's Home, testified that she had been involved with Zonisha's case from November 1996 until January 1999. Conrad testified that there had always been a consistent plan for notifying appellant of Zonisha's medical appointments and hospitalizations. According to Conrad, Blauman initially notified appellant of the appointments when she dropped Zonisha off for her visits with appellant. Subsequently, Conrad testified, when Blauman was no longer driving Zonisha to her visits, Blauman would attach a note to Zonisha's diaper bag and either Conrad or the CCDCFS social worker would notify appellant of the appointment. Conrad testified that appellant never asked for assistance in being transported to the appointments or to the hospital. Similarly, according to Conrad, appellant never expressed an interest in learning how to administer Zonisha's breathing treatments.
Conrad also testified that Zonisha still had many medical needs, including chronic, severe asthma and a high susceptibility to upper respiratory infections. According to Conrad, anyone caring for Zonisha needed to be able to quickly recognize and respond to Zonisha's medical problems.
Audrey Rush, case manager at Bellefaire Jewish Children's Bureau (Bellefaire) for Amelia Jones, the daughter of appellant and Smith, testified that Amelia had been in foster placement since April 1998, when she was born. Rush testified further that Amelia had bowel problems which required a special diet and daily medication.
According to Rush, in July 1999, appellant began unsupervised weekend visits with Amelia. On July 23, 1999, Rush transported Amelia to appellant's home. Upon her arrival, Rush gave Amelia's medication to appellant and explained how it was to be administered. After Amelia returned to her foster home on July 25, 1999, she became ill and had to be taken to the emergency room. Due to the nature of Amelia's illness, there was concern that Amelia had not received her medication during her visit with appellant.
Rush transported Amelia to appellant's home for another weekend visit on August 6, 1999. On this occasion, Amelia required two medications, one for her bowel problems and one for an ear infection. Upon arriving at appellant's home, Rush provided appellant with written instructions from the foster mother regarding Amelia's medications. The note also included the foster mother's telephone number and an invitation to appellant to call her if she had any questions or problems. Rush testified that she again tried to explain to appellant how to dispense the medications, but appellant became angry that she was being told what to do.
On August 8, 1999, when Rush picked Amelia up after the visit, appellant told Rush that she gave Amelia her medications and the visit went well. Upon inspecting the bottles, however, Rush noticed that the medicine levels, which had been marked prior to the visit, had not changed. Upon her return to her foster home, Amelia experienced extreme pain with a bowel movement and had traces of blood in her stool. When Rush confronted appellant on a later date, appellant admitted that she had not given Amelia her medicine because she did not know how to space the two medications.
Rush testified that appellant told her that Smith initiated contact with her in May 1999 when he followed her as she got off the bus. Rush testified further that appellant told her that she gave Smith a picture of Amelia because that was the closest he was going to get to her child. On cross-examination, Rush admitted that she had no reason to believe that appellant encouraged any contact with Smith and appellant had never indicated to her that she had any intention of getting back together with Smith. Rush testified, however, that she was concerned about appellant's recent contacts with Smith and her commitment to protect her children from him.
Deborah Ruffin testified at the permanent custody hearing on July 13, 1999 that she became Zonisha's caseworker at Berea Children's Home in January 1999. Ruffin testified that Zonisha had one medical appointment in February 1999 and two in March 1999, none of which appellant attended, even though Ruffin had personally advised her of the appointments. Ruffin testified that Zonisha's chronic asthma and weak respiratory system required constant monitoring by her caretaker. According to Ruffin, Zonisha's condition could be life-threatening if her caretaker did not have access to immediate, reliable medical care.
Ruffin testified further that although individual counseling had been a long-standing requirement of appellant's case plan, appellant had only begun counseling as recently as April 1999.
Ruffin also testified that appellant had told her that Smith had abused her older children. Appellant also told Ruffin about her recent contacts with Smith and admitted to her that she had not called the police, as instructed, when he approached her. Ruffin testified that in light of appellant's history with Smith, she would be very concerned if Zonisha was placed with appellant.
On cross-examination, Ruffin admitted that in June 1999, she had written a letter to McDade in which she indicated that she had observed considerable improvement over the last five months in the interaction between appellant and Zonisha during visits and recommended increased visitation, with the long-term goal of reunification. Ruffin testified that reunification was her recommendation, however, only if Katrina continue[d] in her counseling. Ruffin testified further that it would be premature at that time to reunite appellant with Zonisha because appellant had only recently begun her individual counseling. Ruffin also testified that she still ha[d] concerns about the medical issues and appellant's non-attendance at Zonisha's medical appointments.
At the permanent custody hearing on November 18, 1999, Debora Gault, coordinator of the medically fragile foster case program at Berea Children's Home and Deborah Ruffin's supervisor, testified that the recommendation of Berea Children's Home as of that date was that Zonisha not be reunited with appellant. Gault testified that although Berea Children's Home had initially been in favor of reunification, it had changed its recommendation because of appellant's problems in properly administering medication to Amelia during her home visits in August 1999 and appellant's recent contacts with Willie Smith.
Dr. Thomas Anuszkiewicz testified that on September 15, 1998, he administered the comprehension subtest of the Wechsler Adult Intelligence Scale to appellant, conducted a clinical interview and mental status examination of appellant and reviewed a case summary provided by McDade. As a result of the testing and interviews, Dr. Anuszkiewicz concluded that appellant suffered from dependent personality disorder.
Dr. Anuszkiewicz also concluded that appellant had difficulty applying what she understands to real-world decision-making. He testified that the testing also indicated that she had major difficulties in social functioning, judgment and decision-making, in addition to moderate difficulties in occupational functioning. Dr. Anuszkiewicz concluded that appellant had a history of prioritizing men and her personal needs above the safety and care of her children. Therefore, Dr. Anuszkiewicz concluded that appellant was at high risk of abusing or neglecting her children.
Despite these concerns, Dr. Anuszkiewicz testified that at the time of the evaluation in September 1998, he believed that appellant's prognosis was fair. He reasoned that due to her young age and lack of substance abuse or criminal history, appellant had the potential to change. Therefore, he reported that appellant needed to demonstrate a sustained effort to move actively towards her goals, comply with her case plan objectives, obtain full-time employment and attend ongoing counseling. In light of appellant's prior delay in achieving these goals, Dr. Anuszkiewicz recommended that the goals be accomplished within six months of the evaluation.
At the permanent custody hearing held one year after the evaluation, however, appellant had not completed any of Dr. Anuszkiewicz's recommendations. Dr. Anuszkiewicz testified that given appellant's failure to attain the objectives, he believed that appellant's prognosis was less favorable and the risk of abuse or neglect of her children had increased. He testified further that appellant's pattern of bad judgment and poor decision-making would possibly never change.
Doreen Berts testified for appellant that she was the executive director of Informing Our Children, Inc., an agency that works with parents to reunite families. According to Berts, appellant contacted her agency in December 1998, on her own initiative. In April 1999, appellant began attending weekly counseling sessions at the agency. These weekly sessions continued until September 1999, when appellant began attending monthly sessions. Berts testified that the change from weekly to monthly sessions occurred because CCDCFS would not pay for the sessions and appellant's counselor believed that monthly sessions were sufficient. Berts testified that she believed appellant had learned from her past and she had no concerns regarding appellant's reunification with her children.
On cross-examination, Berts testified that she was not aware of Zonisha's special medical needs nor did she know how long appellant had been working on her case plan. Berts testified further that although appellant had told her that Smith had abused her, she was not aware of the nature of the abuse of appellant's older children nor that appellant had spoken with Smith in May 1999. Berts also acknowledged that she did not know whether appellant had undergone any domestic violence counseling or parenting education.
On December 2, 1999, the trial court entered an order committing Zonisha to the permanent custody of CCDCFS.[1]
Appellant timely appealed, raising three assignments of error for our review. Appellant's first assignment of error states:
 I. BY FINDING THAT ZONISHA SMITH COULD NOT BE RETURNED HOME WITHIN A REASONABLE TIME WHEN THAT FINDING WAS NOT SUPPORTED BY CREDIBLE EVIDENCE, THE JUVENILE COURT DENIED APPELLANT'S DUE PROCESS RIGHTS AND HER ESSENTIAL, BASIC RIGHT TO RAISE HER DAUGHTER.
The termination of parental rights in a natural child, when the child is neither abandoned or orphaned, is governed by R.C. 2151.414(B), which provides that a court may grant permanent custody of a child to the agency if the court determines, by clear and convincing evidence,[2] that 1) it is in the best interest of the child to grant permanent custody of the child to the agency; and 2) the child cannot be placed with either of his parents within a reasonable period of time or the child should not be placed with his parents.
R.C. 2151.414(E) sets forth guidelines for determining whether a child cannot be placed with either of his parents within a reasonable period of time or should not be placed with his parents:
 In determining * * * whether a child cannot be placed with either of his parents within a reasonable period of time or should not be placed with his parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either of his parents within a reasonable time or should not be placed with either parent.
The statute then lists various factors for the court to consider, including:
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. * * *
Once the trial court finds from all relevant evidence that one of the factors exists and the child cannot or should not be placed with either of his parents, it then must consider whether permanent custody is in the best interest of the child. In re William S. (1996), 75 Ohio St.3d 95,99. In determining whether permanent custody is in the best interest of a child, R.C. 2151.414(D) requires the juvenile court judge to consider all relevant factors, including, but not limited to:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period * * *;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 (5) Whether any of the factors in division (E)(7) to (11) of [R.C. 2151.414(E)] apply in relation to the parents and child.
It is axiomatic that both the best interest determination and the determination that the child cannot be placed with either parent focus on the child, not the parent. In re Awkal (1994), 95 Ohio App.3d 309, 315. As this court stated in In re Awkal, supra:
 R.C. 2151.414(D) is written broadly and requires the juvenile court judge to consider all factors that are relevant to the best interest of the child. The purpose of a far-reaching inquiry is to allow the judge to make a fully informed decision on an issue as important as whether to terminate parental rights, privileges and responsibilities. The discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. Moreover, the knowledge the juvenile court gains at the adjudicatory hearing through viewing the witnesses and observing their demeanor, gestures and voice inflections and using these observations in weighing the credibility of the proffered testimony cannot be conveyed to a reviewing court by a printed record. * * * Hence, this reviewing court will not overturn a permanent custody order unless the trial court has acted in a manner that is arbitrary, unreasonable or capricious. Id. at 316. (Citations omitted.)
In its order granting permanent custody to CCDCFS, the trial court found that Zonisha could not or should not be placed with appellant because following the placement of the child outside of the home, the parent has failed continuously and repeatedly for a period of six (6) months or more to substantially remedy the conditions causing the child to be placed outside the home. The court also found that the parent has failed or refused to provide basic necessities, regular support, visit or communicate with the child when able to do so or by other actions has shown an unwillingness to provide an adequate permanent home for the child.
Appellant asserts that the trial court erred in granting permanent custody of Zonisha to CCDCFS because the court's finding that Zonisha could not be placed with her within a reasonable time or should not be placed with her was not supported by clear and convincing evidence. We disagree.
Zonisha was removed from appellant's custody in 1996 after she experienced a lengthy hospitalization resulting from medical problems that appellant did not address. Upon Zonisha's removal, CCDCFS developed a case plan for appellant to enable Zonisha to be returned to her custody. Appellant's case plan objectives included completing domestic violence counseling, obtaining stable housing, undergoing a psychological evaluation and participating in Zonisha's medical care.
The record contains clear and convincing evidence that three years after Zonisha was removed from her custody, appellant still failed to recognize the severity of Zonisha's medical condition, one of the factors which led to her removal from appellant's custody. At the time of the permanent custody hearings, Zonisha was still considered medically fragile, suffering from severe and chronic asthma, requiring three breathing treatments each day. All of the service providers involved with Zonisha agreed that her medical problems require a caregiver who is able to recognize when she is getting ill and address the problem immediately, before it becomes life-threatening. Appellant's failure to adequately treat her daughter Amelia during her weekend visits, however, and her lies about her failure to treat her, indicated that as late as August 1999, appellant still failed to comprehend the complexity of her children's medical needs and their need for adequate treatment.
Moreover, the record reflects that appellant consistently failed to comply with her case plan objective of participating in Zonisha's medical care. Over the three years that Zonisha had been in foster care, she had approximately one-hundred and fifty medical appointments and twelve hospitalizations. Despite being notified of the appointments and hospitalizations, appellant attended only ten medical appointments and visited Zonisha during only six of the hospitalizations. In February and March 1999, while the motion for permanent custody was pending, appellant again failed to appear at three scheduled appointments. As the trial court properly found, appellant's failure to attend Zonisha's medical appointments demonstrated a lack of commitment toward Zonisha and an unwillingness to provide an adequate permanent home for her.
Appellant's argument that her absences were caused by her lack of transportation and a haphazard system of notifying her about the scheduled appointments is simply not supported by the evidence. First, the evidence indicates that both the foster mother and case manager advised appellant of each appointment and hospitalization. Moreover, appellant offered no evidence at the permanent custody hearing that she could not attend the appointments because she lacked transportation. To the contrary, the evidence is clear that appellant knew how to use the bus system (indeed, Smith allegedly followed her in May 1999 when she got off the bus) and, significantly, never asked CCDCFS or the foster care agency for assistance with transportation.
The evidence is also clear that although appellant attended domestic violence counseling from April 1997 until October 1997, she did not benefit from the counseling. Indeed, appellant told Teresa McDade, a CCDCFS social worker, that she had not benefitted from the counseling. When McDade referred her for more counseling, however, appellant informed her that she would not participate because she did not need more counseling. Despite appellant's attitude, McDade referred her to two additional programs. Appellant did not contact either program, however. It was not until April 1999, nearly two and one-half years after Zonisha had been taken into custody by CCDCFS and more than one year after CCDCFS had filed its motion for permanent custody, that appellant returned to counseling. At the time of the permanent custody hearings, appellant's counselor recommended that she continue in therapy indefinitely.
Appellant argues that the Agency's delay in including individual counseling on her case plan and its refusal to pay for her individual counseling sessions were the reason for her failure to adequately address her domestic violence and dependency issues before the permanent custody hearing. We disagree.
Counseling services were offered to appellant as early as November 1996. Although appellant engaged in counseling from April 1997 through October 1997, the counseling, by appellant's own admission did not resolve her problems. From October 1997 through April 1999, however, appellant did not enter into any further treatment because she did not feel that it was necessary to do so. Appellant returned to counseling in April 1999 — two and one-half years after her child was removed from her custody and one year after CCDCFS had filed for permanent custody of Zonisha — only after being ordered by the Juvenile Court to do so.
Similarly, appellant was required as early as November 1996 to complete a psychological evaluation so the CCDCFS could determine the extent of her emotional problems and the specific services she required. Appellant was referred five times for the evaluation, but each time she failed to appear for the appointment. Appellant did not complete the evaluation until September 1998, nearly two years after Zonisha had been removed from her custody and five months after CCDCFS had filed its motion for permanent custody. Thus, it is apparent that it was appellant's lack of commitment toward Zonisha, not any failure on the part of CCDCFS, that prevented appellant from adequately resolving her emotional issues prior to the permanent custody decision.
Moreover, contrary to appellant's argument, the Agency's lingering concerns regarding her failure to distance herself from Smith, the man who had beaten and raped her, sexually abused her daughter and attempted to drown her son in a bathtub, were valid. According to Teresa McDade, appellant's social worker, in October 1997, after appellant had completed her domestic violence counseling, appellant told her that she still loved Smith. In February 1998, appellant informed McDade that Smith had the right to see Amelia because he was her father and further, appellant expressed no concern regarding Smith's actions toward her older children.
In May 1999, shortly before the permanent custody hearing, appellant also had two conversations with her abuser, Willie Smith. In one conversation, appellant gave Smith a picture of Amelia, her daughter with Smith. In another conversation, appellant told Smith that after she received custody of her children, she would allow him to visit Amelia. Appellant did not call the police on either occasion, as the Juvenile Court had ordered only one month prior to appellant's contacts with Smith. Due to appellant's history with Smith and her recent contacts with him, McDade testified that she did not believe that appellant was willing to protect her children from Smith and recommended permanent custody to CCDCFS.
Appellant contends that the agency's concerns about her relationship with Smith have little substance, however, because there was no evidence that she initiated the contacts with Smith and she had begun a healthy relationship with a new man. The evidence adduced at the permanent custody hearing was unequivocal, however, that appellant saw Smith shortly before the permanent custody hearing, gave him a picture of Amelia and told him that he could see Amelia after she obtained custody of her. In light of Smith's abuse of appellant's older children, appellant's statements to Smith were of great concern and indicated that she had not resolved the issues surrounding the abuse that initially led to Zonisha's removal from her custody.
Finally, we note that appellant misrepresents the record by asserting that Deborah Ruffin, Zonisha's foster care worker at Berea Children's Home, represents the current position of Berea Children's Home, i.e., conditional reunification between Zonisha and appellant. The record is clear that although Berea Children's Home once supported conditional reunification, as of November 1999, the agency recommended that Zonisha not be reunited with appellant.
Moreover, contrary to appellant's assertions, the guardian ad litem did not recommend immediate reunification. Although the guardian ad litem did not support the grant of permanent custody to CCDCFS, he also indicated that immediate reunification was not appropriate.
In short, the evidence adduced at the permanent custody hearing clearly and convincingly established that appellant had continuously and repeatedly failed to substantially remedy the conditions that led to Zonisha's removal from her custody and had shown an unwillingness to provide an adequate home for Zonisha. Accordingly, the trial court did not abuse its discretion in finding that Zonisha could not or should not be placed with appellant. Appellant's first assignment of error is overruled.
Appellant's second assignment of error states:
 II. WHEN INDIVIDUAL COUNSELING WAS REQUIRED OF APPELLANT AS A CONDITION TO REUNIFICATION, BUT THAT SERVICE WAS NOT PROVIDED BY APPELLEE, THE TRIAL COURT ERRED IN FINDING THAT APPELLEE MADE REASONABLE EFFORTS TO REUNIFY ZONISHA SMITH WITH HER MOTHER.
In her second assignment of error, appellant contends that the trial court erred in finding that CCDCFS made a reasonable effort to reunite her with Zonisha, as required by R.C. 2151.419, because it failed to provide individual counseling to her, even though it was an objective of her case plan. This argument is without merit.
Although appellant claims that she did not attend individual counseling because she could not afford it and CCDCFS would not pay for it, the record refutes appellant's assertion. Teresa McDade testified that appellant attended individual counseling sessions at Murtis Taylor from December 1997 through February 1998, but then abruptly quit attending, without any explanation. McDade also referred appellant for individual counseling at Laurelwood Counseling Center after appellant told her that she had not benefitted from her domestic violence counseling sessions, but appellant did not contact Laurelwood, informing McDade that she did not need and would not participate in any more counseling. McDade again attempted to refer appellant for individual counseling after the completion of the psychological evaluation, but appellant would not accept the referral.
Contrary to appellant's argument, it was not the refusal of CCDCFS to pay for individual counseling that impeded appellant's progress on her case plan. Rather, it was appellant's failure from February 1998 until April 1999 to acknowledge that she needed counseling and to begin the sessions. Appellant's second assignment of error is therefore overruled.
Appellant's third assignment of error states:
 III. AS THE RECORD CONTAINS NO REPORT BY THE GUARDIAN AD LITEM, AND NO INDICATION OF THE CHILD ZONISHA'S WISHES REGARDING PERMANENT CUSTODY, THE PERMANENT CUSTODY DISPOSITION MUST BE REVERSED FOR FAILURE TO CONSIDER ALL FACTORS REQUIRED BY STATUTE.
R.C. 2151.414(D) provides that in determining whether permanent custody is in the best interest of a child, the trial court shall consider all relevant factors, including, but not limited to * * * (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child.
In her third assignment of error, appellant asserts that the judgment granting permanent custody of Zonisha to CCDCFS must be reversed because there is no letter of recommendation in the file from the guardian ad litem and the trial court did not ask Zonisha who she wanted to live with. Appellant's argument is without merit.
First, Zonisha was only three and one-half years old at the time of the permanent custody hearings. Given her tender age, the trial court's failure to expressly take into account Zonisha's wishes was appropriate. See, e.g., In the Matter of Sabastian Campbell (June 8, 2000), Franklin App. No. 99AP-986, unreported; In re Devon (Feb. 5, 2001), Franklin App. No. OoAP-1191.
Moreover, the record reflects that the guardian ad litem made an oral recommendation to the trial judge that permanent custody be denied. Thus, the trial judge was aware of the guardian ad litem's recommendation and, apparently, chose to reject it.
Although a trial court is required to consider each of the factors set forth in R.C. 2151.414(D) in making its decision, only one of these factors needs to be resolved in favor of the award of permanent custody. In re Shaeffer Children (1993), 85 Ohio App.3d 683 . Here, the evidence was overwhelming, even without expressly considering the wishes of young Zonisha, that permanent custody was in her best interest.
Appellant's third assignment of error is therefore overruled.
It is ordered that appellee recover of appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Juvenile Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 __________________________ TIMOTHY E. McMONAGLE, P.J.:
KENNETH A. ROCCO, J. and COLLEEN CONWAY COONEY, J., CONCUR.
[1] The trial court granted temporary custody of Zonisha's younger sister, Amelia Jones, to CCDCFS, with the goal of reunification with appellant.
[2] Clear and convincing evidence is defined as hat measure or degree of proof which is more than a mere `preponderance of evidence' but not to the extent of such certainty as is required `beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established. Lansdowne v. Beacon Journal Publishing Co. (1987),32 Ohio St.3d 176, 180-181.